UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FELICIANO VELASCO ROJAS, *et al.,*

     Plaintiff,

                             Case No. 1:23-cv-604

v.

                             Hon. Paul L. Maloney

FIRST PICK FARMS LLC, *et al.,*

     Defendants.

_____/

## OPINION

There are two motions to dismiss before the Court.  The first one (ECF No. 64) is from Defendants First Pick Farms, Grow Blue Farms Hourly, Grow Blue Farms Salary, and Grow Blue Farms.  The second one (ECF No. 67) is from Defendants First Pick Farms Management and HB Hive and Company.  For the following reasons, Defendants' motions will be granted in part and denied in part.

## I. BACKGROUND

In May 2017, Plaintiffs Feliciano Velasco Rojas and Luis Guzman Rojas entered the United States from Mexico.  Plaintiffs had a contract to work on a farm in North Carolina as part of the H-2A visa program.  (2d Am. Compl. ¶ 52, ECF No. 63.)  Under their contract, they expected to receive free housing, an hourly wage, and reimbursement for the travel expenses once the contract was complete.  (*Id.*)  But their time in North Carolina was cut short after only a few weeks.  (*Id.* ¶ 53.)

One night, they were awakened by Antonio Sanchez.  (*Id.*)  Sanchez told Plaintiffs and about thirty other workers that they had only a few hours to pack their bags before they boarded a bus to Michigan, where they would work on a blueberry farm.  (*Id.* ¶ 55.)  He threatened to call immigration if anyone complained to anybody else about moving to Michigan.  (*Id.* ¶ 58.)  So Plaintiffs packed their bags and let Sanchez take their pictures to make fake identities for them to use at their new jobs.  (*Id.* ¶ 53.)  Sanchez charged Plaintiffs for these documents and for transportation.  (*Id.* ¶¶ 66-67.)

When they arrived in Michigan, Sanchez again threatened to call immigration if anyone complained.  (*Id.* ¶ 85.)  Plaintiffs used their fake identities to pass their new employers' screening process.  (*Id.* ¶ 72.)  They moved into a 1,500-square foot house, which they shared with about twenty-eight other workers.  (*Id.* ¶ 70.)  The house was unfurnished with only one kitchen and bathroom.  (*Id.* ¶ 114.)  Their new employers charged them rent.  (*Id.* ¶ 94.)

In June 2017, Plaintiffs started their job picking blueberries.  (*Id.* ¶¶ 15-16.)  Plaintiffs' new employers assigned Plaintiff Guzman to transport the workers from the house to the work site.  (*Id.* at ¶ 128.)  Plaintiff Guzman did not have a U.S. driver's license, and he was never paid for his work as a driver.  (*Id.*)  Sanchez charged the workers for the transportation service.  (*Id.* ¶ 96.)

Plaintiffs worked twelve-hour days without breaks or days off.  (*Id.* ¶ 7.)  They were paid according to how much they picked.  (*Id.* ¶ 124.)  Sanchez was one of their supervisors.  He gave them instructions and reviewed their work.  (*Id.* ¶ 120.)  He continued to threaten to call immigration if anyone complained about their working conditions, promising to alert

the authorities about Plaintiffs' use of fake identities.  (*Id.* ¶ 86.)  Plaintiff Guzman left the

farm at the end of the season in September 2017.  (*Id.* ¶ 15.)  Plaintiff Velasco left a month

later.  (*Id.* ¶ 16.)

In June 2023, Plaintiffs sued the companies that operate the blueberry farm:

Defendants First Pick Farms, First Pick Farms Management, HB Hive and Company, Grow

Blue Farms, Grow Blue Farms Hourly (GBF Hourly), and Grow Blue Farms Salary (GBF

Salary).  They allege that all six Defendants are liable for violations of the Trafficking Victims

Protection Reauthorization Act (TVPRA) and the Migrant and Seasonal Agricultural

Worker Protection Act (AWPA).

Now, all six Defendants move to dismiss Plaintiffs' Second Amended Complaint for

failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (ECF Nos. 64, 67).[1]

In response, Plaintiffs argue that their complaint alleges enough facts to survive Defendants'

motions.  (ECF Nos. 71-72.)

## II. LEGAL STANDARD

A party may assert a defense for "failure to state a claim" through a motion to dismiss

under Rule 12(b)(6).  A motion to dismiss "is a test of the plaintiff's cause of action as stated

in the complaint, not a challenge to the plaintiff's factual allegations."  *Golden v. City of

Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005).  To survive the motion, the plaintiff's

complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible when it contains

---

[1] Each motion deals with similar issues even though they were filed by different groups of Defendants.  To keep things simple, the Court will refer to them as a single motion and to Defendants as a single group.

"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  If more than one reasonable inference can be drawn from an allegation, the Court construes the facts "in the light most favorable to the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426 (6th Cir. 2008).  That said, the Court must ignore any legal conclusions that are unsupported by factual allegations. *Iqbal*, 556 U.S. at 678.

## III. GROUP PLEADING

At times, the Second Amended Complaint treats the six corporate Defendants as a single group called "Defendant Enterprise."  There is no general rule against group pleading.  But Defendants argue that the Second Amended Complaint's group pleading amounts to a "shotgun pleading."

The Sixth Circuit does not often use the term "shotgun pleading" outside of cases involving constitutional claims.  *Arnold v. CooperSurgical, Inc.*, 681 F. Supp. 3d 803, 823 (S.D. Ohio 2023).  In one case, the panel used the term to refer to a plaintiff's failure to "connect specific facts or events with the various causes of action she asserted." *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 393 (6th Cir. 2020).  The panel held that this style of pleading broke Rule 8(a)(2), which requires plaintiffs to give "adequate notice of the claims against [defendants] and the grounds upon which each claim rests." *Id.* at 392-93; *see also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of [each] claim showing that the pleader is entitled to relief").

Other courts in this circuit describe a "shotgun pleading" as one that makes it "virtually impossible for a defendant to know which allegations of fact are intended to support

which claims for relief." *K.O. v. G6 Hosp., LLC*, 728 F. Supp. 3d 624, 640 (E.D. Mich. 2024); *Arnold*, 681 F. Supp. 3d at 823 (collecting cases).  In this style of pleading, the goal is to "overwhelm defendants with an unclear mass of allegations and make it difficult [or] impossible for the defendants to make informed responses to the plaintiff's allegations." *K.O.*, 728 F. Supp. 3d at 640.  So whether a "shotgun pleading" violates "Rule 8(a) is often dependent on the facts and claims at issue." *Igo v. Sun Life Assurance Co. of Can.*, 652 F. Supp. 3d 929, 934 (S.D. Ohio 2023) (collecting cases).  But in general, courts addressing arguments about "shotgun pleading have . . . declined to dismiss the complaint on that basis alone." *K.O.*, 728 F. Supp. 3d at 641 (collecting cases).

When a plaintiff alleges that multiple defendants engaged in the same conduct, these allegations give "adequate notice" if they "raise a reasonable expectation that discovery will reveal evidence to support their claims." *Faloba v. Ultium Cells LLC*, No. 4:24-CV-01569, 2025 WL 1042699, at *19 (N.D. Ohio Apr. 8, 2025) (collecting cases).  In this case, it is reasonable to expect that discovery will reveal the role that each Defendant played as part of their blueberry-harvesting business.  So Plaintiffs' use of "Defendant Enterprise" is not enough by itself to dismiss their complaint for failure to give adequate notice.

Aside from Plaintiffs' allegations against "Defendant Enterprise," Plaintiffs also allege specific facts about how each Defendant relates to each other as part of their business. Plaintiffs argue that these facts justify treating Defendants as a collective.  In general, courts treat multiple entities as a collective to implement a statute or to avoid some unjust outcome that might result from defendants' opaque corporate structure.  At this stage, it is not appropriate to dismiss Plaintiffs' complaint given the nature of their claims and the fact that

5

Defendants had an opportunity in their briefing to make an informed response to Plaintiffs' arguments—which they did.

Finally, Plaintiffs allege facts specific to their employment, including how they were recruited, what work they did, where they worked, where they lived, and what aliases they used. From that, Defendants should be able to identify Plaintiffs (as compared to other workers) and their employment relationship or lack thereof. *K.O.*, 728 F. Supp. 3d at 641 (analyzing how broad allegations combined with facts that are specific to the plaintiffs' relationship with each defendant satisfy Rule 8). Thus, Plaintiffs' allegations satisfy Rule 8(a)(2).

## IV. ALTER-EGO DOCTRINE

GBF Hourly and GBF Salary were created more than four years after the alleged violations occurred.[2] Plaintiffs argue that all six Defendants, including GBF Hourly and GBF Salary, are still liable as alter egos of each other. In general, the law "recognizes the limitation of liability that the adoption of a corporate form creates." *N.L.R.B. v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 335 (6th Cir. 1990). But the law also recognizes certain situations when one corporation may be held liable for the actions of another under the alter-ego doctrine.

Courts first look at the statutes for guidance on alter-ego doctrine. *Brown v. Astro Holdings, Inc.*, 385 F. Supp. 2d 519, 531 (E.D. Pa. 2005). If the statutes are silent as they

---

[2] The Court takes judicial notice of GBF Hourly and GBF Salary's articles of organization attached to Defendants' motion to dismiss (Ex. A, ECF No. 64-1; Ex. B, ECF No. 64-2). The Court may take notice of government records at this stage. *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 971-72 (W.D. Mich. 2003) (collecting cases).

are here, courts refer to the common law.  Because the TVPRA and the AWPA are federal statutes, "any common law rule necessary to effectuate a private cause of action under [them] is necessarily federal in character."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97 (1991).

Despite the federal character of the common law, courts generally apply state law as the "federal rule of decision."  *Id.* at 98.  Cases in which courts can engage in common lawmaking are "few and far between."  *Rodriguez v. FDIC*, 589 U.S. 132, 134 (2020).  Courts are allowed to apply the "federal common law" when it is "necessary to protect uniquely federal interests," *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981); when Congress "give[s] the courts the power to develop substantive law," *id.*;  when there is a "distinct need for nationwide legal standards," *Kamen,* 500 U.S. at 98; when "express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand," *id.*; when applying state law "would frustrate specific objectives of the federal programs," *id.*; and when two states are parties, the United States is a party, or admiralty law applies, *Texas Indus.*, 451 U.S. at 640.

Plaintiffs argue for a mix of federal and state common law standards.  Specifically, they rely on the federal common law as it is applied in labor cases.  The labor standard extends liability from older entities that existed at the time of the breach to newer entities that merely continue as "disguised continuance[s] of the old employer."  *Fullerton Transfer*, 910 F.2d at 336.  So in theory, this test could hold GBF Hourly and GBF Salary liable for the actions of the other four Defendants.

But Plaintiffs do not justify the use of either the labor standard or the traditional federal common law standard. The purpose of the labor standard was to be a "more relaxed, less exacting" version of the traditional standard to help agencies better "effectuate federal labor policies." *Id.* Those policies are not part of this case, so the labor standard does not apply.[3]

The traditional standard also does not apply here. The Sixth Circuit may apply this standard to defendants that fail the threshold inquiry for the labor standard, *id.* at 338, and to defendants in ERISA cases, *PACE Indus. Union-Mgt. Pension Fund v. Dannex Mfg. Co.*, 394 F. App'x 188, 198 (6th Cir. 2010). The use of the traditional standard is justified in labor and ERISA cases based on a need for uniformity and a risk that state law would frustrate federal law. *See Jenkins v. Comm'r of Internal Revenue*, 121 T.C.M. (CCH) 1418 (Tax 2021) (collecting cases). In the absence of this kind of reasoning, courts apply the alter-ego doctrine under state law. *Id.* (collecting cases).[4]

The parties dispute whether Defendants are alter egos of each other by referring to Michigan law. One Defendant, Grow Blue Farms, is incorporated in Delaware, but neither side argues for the use of Delaware law. So for this case, the Court applies Michigan law.

---

[3] In at least one case, a court applied the labor standard to a non-labor case, but it did so without any justification. *See Ickes v. Nexcare Health Sys., L.L.C.*, 178 F. Supp. 3d 578 (E.D. Mich. 2016). The Court declines to extend the test beyond the boundaries of its use by the Sixth Circuit.

[4] As an alternative to the alter-ego doctrine, Plaintiffs argue that Defendants should be treated as a single entity under the federal common law's "integrated enterprise" or "single employer" test. But this test does not apply to statutes like the AWPA that offer separate guidance on how to construe multiple entities acting as one. Courts do apply common law tests in TVPRA cases, however, to treat multiple entities as a given employee's employer. The Court analyzes Defendants as a "single employer" in Part V.A.2(a).

Michigan law presumes that a corporate entity is distinct from its owner absent "some abuse of corporate form." *Green v. Ziegelman*, 873 N.W.2d 794, 803 (Mich. App. 2015). When corporate form is used to "subvert justice," the corporate form is "ignored by the courts" to better "avoid [that] fraud or injustice." *Id.* To hold the owner liable for its entity's wrongdoing, a plaintiff must allege: (1) that the entity was the mere instrumentality of the owner, (2) that the owner used the entity to commit a fraud or wrong, and (3) that the fraud or wrong resulted in an unjust loss or injury. *Id.* at 806. The Court first assesses whether the actions of the four Defendants in existence during the 2017 blueberry season are attributable to the two Defendants created years later.

### A. Grow Blue Farms Salary and Grow Blue Farms Hourly

Plaintiffs argue that the other four Defendants were alter egos of GBF Hourly and GBF Salary. Plaintiffs allege that GBF Hourly and GBF Salary are wholly owned subsidiaries of Grow Blue Farms. They also allege that the other Defendants are or were owned, in some combination, by Defendant Grow Blue Farms, non-party GBF Corporation, or non-party Tom Mitchell. Tom Mitchell, in turn, also owns GBF Corporation and Grow Blue Farms.

In general, Michigan courts apply the alter-ego doctrine when one entity owns another. *Green*, 873 N.W.2d at 803; *see also Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995) ("Michigan courts have generally required that a *subsidiary* must become a mere instrumentality of the *parent* before its separate corporate existence will be disregarded.") (emphasis added) (citation modified). The only ownership relationship that Plaintiffs allege regarding GBF Hourly and GBF Salary is with Grow Blue Farms. Neither

GBF Hourly nor GBF Salary have an ownership relationship with FPF Management, HB Hive, or First Pick Farms.

In addition, Michigan courts typically apply the alter-ego doctrine to hold *owners* responsible for the actions of the corporations *that they own*.  *Green*, 873 N.W.2d at 803. In contrast, Plaintiffs argue that two subsidiaries should be held liable for the actions of their parent.  The Michigan Court of Appeals has expressed skepticism of this idea.  *Lawton v. Gorman Furniture Corp.*, 282 N.W.2d 797, 801 (Mich. App. 1979) ("[T]o support the trial court's conclusion that a dominated and wholly owned subsidiary corporation is chargeable with the actions of its parent is to stand the doctrine of piercing the corporate veil 'on its head' . . . .").

Michigan law by itself does not require an ownership relationship or a unidirectional subsidiary-to-parent transfer of liability.  Some federal courts interpreting state law have applied alter-ego doctrine in a way where ownership was not required.  *See Innovation Ventures, L.L.C. v. Custom Nutrition Laboratories, L.L.C.*, No. 4:12-CV-13850-TGB-MJH, 2021 WL 12255004, at *28 (E.D. Mich. Sept. 29, 2021) (discussing *Scarff Bros., Inc. v. Bischer Farms, Inc.*, 386 F. App'x 518 (6th Cir. 2010)).  But other federal courts interpreting the same state law have declined to expand alter-ego liability beyond the typical case without justification from the parties to do so.  *See Gering v. Fraunhofer USA, Inc.*, No. 05-73458, 2009 WL 2877414, at *4 (E.D. Mich. Sept. 3, 2009).  Here, Plaintiffs do not provide any justification to extend alter-ego liability outside the typical case.  The Court declines to come up with its own reasoning to do so for them.

Even if the Court decided to hold a subsidiary liable for the acts of its parents or other entities that share a common owner, Plaintiffs have not alleged sufficient facts to pass the test under Michigan law.  As mentioned above, GBF Hourly and GBF Salary did not exist until years after the alleged violations.  There is no general rule that entities created after a violation are excluded from alter-ego liability.  Still, the post-violation entity must be "used to commit fraud or a wrong" against the plaintiff.  *Green*, 873 N.W.2d at 806.

In this case, Plaintiffs argue that Defendants "used their diffuse corporate structure" to "confuse Plaintiffs about where to seek redress for labor and housing violations." (Response 17-18, ECF No. 71; Response 17-18, ECF No. 72.)  It is unclear whether Plaintiffs are referring to their confusion seeking redress at the time of the alleged violations or at the time of filing their lawsuit.  If it is at the time of the lawsuit, there are no allegations that this confusion led to an "unjust injury or loss."  *Green*, 873 N.W.2d at 806.  If it is at the time of the violations, alter-ego liability would be impossible because GBF Hourly and GBF Salary did not exist until years later.  As a result, the Court declines to extend alter-ego liability to GBF Hourly and GBF Salary as alter egos of the other four defendants.  And because GBF Hourly and GBF Salary were not in existence at the time of statutory violations, they are not independently responsible for those violations either.

### B. First Pick Farms, FPF Management, HB Hive and Company, and Grow Blue Farms

As described above, Plaintiffs failed to provide any justification to extend the typical application of Michigan law without some kind of ownership relationship.  Plaintiffs do not allege an ownership relationship among any of the remaining Defendants except between

First Pick Farms and Grow Blue Farms.  Plaintiffs do not allege sufficient facts about this relationship to infer that First Pick Farms was an alter ego of Grow Blue Farms.  In their response Plaintiffs argue that the complaint alleges a wrong committed as a result of the Defendants' entire "corporate structure."  (Response 17-18, ECF No. 71; Response 17-18, ECF No. 72.)  But there are no facts in the complaint to infer that Grow Blue Farms used First Pick Farms to commit a wrong.  As a result, none of the four remaining Defendants are alter egos of each other.

## V. TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT (TVPRA)

The TVPRA defines a set of certain crimes and allows victims of those crimes to sue those that played a role in committing them.  Under the TVPRA, forced labor is a crime. Section 1589(a) outlaws labor provided or obtained through any combination of the following:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process;[5] or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint . . . .

It is also a crime to either benefit from forced labor or traffic forced laborers.  Section 1589(b) punishes anyone who "knowingly benefits" from "participation in a venture"

---

[5] "The term 'abuse or threatened abuse of law or legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1).

that violates § 1589(a) and who knows of or recklessly disregards the venture's violation.  Section 1590(a) outlaws trafficking by "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this statute."  And § 1594(a) outlaws any attempts to violate certain parts of the TVPRA, including the forced labor and trafficking provisions.

Victims of these crimes may sue those that played a role in committing them. Section 1595(a) allows

> [a]n individual who is a victim of a violation of this chapter [to] bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit,[6] financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and [to] recover damages and reasonable attorneys fees.

So victims can sue both those who committed the crime against them (perpetrator liability) and those who benefited from it (participatory or beneficiary liability).  Those who benefited from a crime may be liable for either their own actions, omissions, and state of mind (direct liability) or their agent's or employee's (indirect or vicarious liability).  *H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 704 (E.D. Mich. 2020).

In this case, Plaintiffs allege that they were victims of violations of 18 U.S.C. §§ 1589, 1590, and 1594.  *See K.L. v. Red Roof Inns, Inc.*, No. 2:22-CV-3769, 2024 WL 1332225, at *2 (S.D. Ohio Mar. 28, 2024) (explaining that a plaintiff's allegation of victimhood of a crime under the TVPRA is enough to survive a motion to dismiss).  They also allege that Defendants either committed these crimes as perpetrators, (2d Am. Compl. ¶¶ 147, 153,

---

[6] The language "or attempts or conspires to benefit" was not effective until January 2023, six years after the alleged violations.  Thus, the Court ignores this language in its analysis.

159, 170), or benefited from the alleged crimes as performed "through [their] employees," (*Id.* ¶¶ 145, 146, 148, 154, 161, 163, 165).  Plaintiffs argue that Defendants benefited from their employees' actions both directly and indirectly.  Each theory is assessed below.

### A. Beneficiary Liability

To plead beneficiary liability, a plaintiff must allege that someone committed a crime under the TVPRA, and that the person who committed the crime had some kind of relationship with the defendants.  In this case, Plaintiffs allege facts to support that Sanchez violated §§ 1589(a), 1589(b), 1590(a), and 1594(a).  Defendants do not contest these allegations.  They only argue that Defendants did not have the required relationship with Sanchez to be held liable.  This argument is the focus of the Court's analysis.

### 1. Direct Liability

Under the civil remedy provision of the TVPRA, victims of a crime must allege (1) that the defendants participated in the venture, (2) that the defendants knowingly benefited or received something of value from their participation in the venture, and (3) that the defendants knew or should have known that the venture committed crimes under the TVPRA.  *See Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 793 (E.D. Mich. 2021) (applying a similar test); *see also H.G.*, 2020 WL 5653304, at *4 (same).

### (a) Participated in a Venture

Section 1595 does not define "participation in a venture."  Defendants argue that "participation in a venture" under § 1595 should be read the same way as "participation in a venture" under § 1591, which criminalizes sex-trafficking.  In *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016), the Sixth Circuit defined "participation in a venture" under §

1591 to mean "that a defendant actually participate[d] and commit[ted] some 'overt act' that further[ed] the sex trafficking aspect of the venture." *Id.* at 286.  There are two key aspects of this definition: (1) that participation requires a defendant to "engage[] is some aspect of" the crime and (2) that the venture must be a venture to commit a specific crime.  *Id.*  If this definition applied to § 1595, Plaintiffs here would need to allege that Defendants overtly acted to advance, or in an attempt to advance, a venture to obtain forced labor or traffic laborers.

But unlike § 1591, "participation in a venture" under § 1595 is "liberally construed" as part of a remedial scheme.  *M.A.*, 425 F. Supp. 3d at 969 (citing *Peyton v. Rowe*, 391 U.S. 54, 65 (1968)).  And unlike § 1595, "participation" under § 1591 requires actual knowledge or reckless disregard of the venture's crimes.  *Id.* at 969-70.  If "participation" were the same under § 1595, it would undermine that section's constructive knowledge element, which creates liability when a beneficiary merely "should have known" about the venture's crimes. *Id.* at 970.  Both circuit courts and most district courts facing this issue have declined to import § 1591's definition of "participation in a venture" into § 1595 for similar reasons.  *See Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724-26 (11th Cir. 2021); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553-54, 554 n.8 (7th Cir. 2023) (collecting cases); *see also K.L.*, 2024 WL 1332225, at *4 (collecting cases).

Without a definition in § 1595, "participation in a venture" should be understood according to its plain meaning.  *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-34 (2019) (supporting the use of dictionaries to determine the plain meaning of words in a statute).  In its plain-meaning analysis of the TVPRA, the Eleventh Circuit determined

15

that defendants "participat[e] in a venture" when they participate, meaning "take part in or share with others in common or in an association," in a venture, meaning an "undertaking or enterprise involving risk and potential profit." *Doe #1*, 21 F.4th at 724 (citing 2019 and 1989 editions of Black's Law Dictionary and the Oxford English Dictionary).  In other words, the venture "can be a commercial venture, like running or expanding a business." *G.G.*, 76 F.4th 544, 554 (citation modified).  This definition is consistent with others used by district courts in the Sixth Circuit.  *See M.A.*, 425 F. Supp. 3d at 970 (requiring "at least a showing of a continuous business relationship between the trafficker and the [beneficiaries] such that it would appear that [they] have established a pattern of conduct or could be said to have a tacit agreement").

In their Second Amended Complaint, Plaintiffs allege that Defendants together ran a business for the harvesting and sale of blueberries.  (2d Am. Compl. ¶ 50.)  Specifically, they allege that First Pick Farms Management, HB Hive, First Pick Farms, and Grow Blue Farms all did business under the name "First Pick Farms."  (*Id.* ¶¶ 23-24, 26-32.)  Under that name, those Defendants operated a farm that cultivated and harvested roughly 2,200 acres of blueberries.  (*Id.* ¶ 23.)  They marketed and sold blueberries while employing several hundred workers.  (*Id.*)  Plaintiffs also allege that Defendants hired Sanchez, who, as their employee and agent, "obtained a labor force for the picking of the blueberry harvest."  (*Id.* ¶ 92.)

In their motion, Plaintiffs argue that the fact that they alleged that Sanchez was Defendants' employee is enough to allege "participation in a venture."  Based on the plain-meaning definition of that phrase, Plaintiffs seem to be right.  But the Court declines to

16

determine whether Sanchez was Defendants' employee for the sake of this element because it is not necessary.[7]  All that is required is that Defendants participated in the same venture as Sanchez in running or operating the blueberry farm.  Plaintiffs have alleged sufficient facts to infer that this was the case.

Still, Defendants argue that Plaintiffs' allegations are insufficient because Sanchez "initiated" the trafficking—not Defendants.  (*Id.* ¶ 92.)  But Defendants' reading of "participation in the venture" is too narrow.  Nowhere in the statute does it say that a beneficiary must have started the trafficking.  It is enough to allege that there was a "continuous business relationship" between the beneficiary and the trafficker.  *M.A.*, 425 F. Supp. 3d at 970.  And when the beneficiary provides "assistance, support, or facilitation" to the trafficker through a "continuous business relationship," a court may infer that there is a "tacit agreement."  *G.G.*, 76 F.4th at 559 (citing *M.A.*, 425 F. Supp. 3d at 970-71).  To that end, Plaintiffs also allege that Sanchez enrolled them in the company payroll system and supervised their work during the 2017 blueberry season.  (*Id.* ¶ 84.)  Therefore, Plaintiffs have met their burden with respect to "participation in a venture."

### (b) Knowingly Benefited or Received Something of Value

This element "merely requires that the defendant knowingly receive a financial benefit."  *Reyes-Trujillo*, 513 F. Supp. 3d at 793 (citation modified).  A plaintiff only needs to allege that the defendant was aware that it was benefiting in some way from its participation

---

[7] Courts have held that "participation in a venture" is satisfied through all kinds of relationships.  *E.g., G.G.*, 76 F.4th at 558 (holding that a consulting company participated in a venture with its client); *Reyes-Trujillo*, 513 F. Supp. 3d at 793 (holding that a business participated in a venture with its labor contractor); *M.A.*, 425 F. Supp. 3d at 969-70 (holding that hotel franchisors and their franchisees participated in a venture with sex traffickers).

in the venture.  *G.G.*, 76 F.4th at 564.  The venture itself does not need to come from profits that are specific to the violation of the TVPRA.  *Id.*

Defendants argue that Plaintiffs failed to support this element with factual allegations. They argue that Plaintiffs only alleged that Defendants benefited from Plaintiffs' labor, not that they benefited from participating in a forced labor venture.  The Court already rejected Defendants' argument that a "venture" under § 1595 must be a venture to break the law. There is nothing in the statute that requires more.  So the only "venture" that matters for this element is Defendants' business in harvesting and selling blueberries.  Plaintiffs' work for the Defendants was part of that venture.  With that in mind, Plaintiffs also allege that

- Sanchez's provision of labor benefited Defendants, (2d Am. Compl. ¶ 78);

- Defendants benefited from a larger workforce, (*Id.* ¶ 93);

- Defendants benefited from Plaintiffs' work, (*Id.* ¶ 154);

- Defendants benefited by deducting rent from Plaintiffs' wages, (*Id.* ¶ 94); and

- Defendants benefited from charging workers for daily transportation, (*Id.* ¶ 96).

Given these allegations, Plaintiffs' burden is satisfied.

### (c) Knew or Should Have Known Venture Violated TVPRA

To state a claim under § 1595, a plaintiff must allege that the beneficiary of a venture's violation "knew or should have known" about that violation.  Whenever a plaintiff must allege knowledge, Federal Rule of Civil Procedure 9 allows them to do so "generally."  But the plaintiff must also "plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation plausible on its face."  *Reyes-Trujillo*, 513 F. Supp.

3d at 794 n.21 (quoting *Katoula v. Detroit Ent., LLC*, 557 F. App'x 496, 498 (6th Cir. 2014)). So here, Plaintiffs must allege facts to show that Defendants had either actual knowledge ("knew") or constructive knowledge ("should have known") about the venture's violations of the TVPRA.

Plaintiffs argue that Defendants had constructive knowledge of the venture's violations.[8]  Constructive knowledge is "knowledge that one using reasonable care or diligence should have, and therefore that is attributable by law to a given person." *Constructive Knowledge, Black's Law Dictionary* (12th ed. 2024).  So under the TVPRA, knowledge of a venture's violation is attributable to a beneficiary when that beneficiary "acted negligently or in reckless disregard of the venture's violations." *Reyes-Trujillo*, 513 F. Supp. 3d at 793; *see also Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022) (applying a negligence standard to "knew or should have known").  A beneficiary may act negligently by "fail[ing] to implement policies sufficient to combat a known problem," like forced labor, within its operations.  *M.A.*, 425 F. Supp. 3d at 968.

A beneficiary's constructive knowledge of any TVPRA violation must be tied to "the *particular* venture in which [it] allegedly participated." *H.G.*, 489 F. Supp. 3d at 704-05 (emphasis omitted).  The beneficiary's "knowledge or willful blindness of a *general . . .* trafficking problem [across an industry]" is not enough. *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) (emphasis added).  At the same time, a beneficiary

---

[8] Plaintiffs do not foreclose the possibility of actual knowledge.

does not need to know the specific victim's identity to be aware of the venture's potential TVPRA violations. *G.G.*, 76 F.4th at 556-58.

As described earlier, Plaintiffs allege facts sufficient to support an inference that Defendants' venture violated §§ 1589(a), 1590(a), and 1594(a). The question now is whether Plaintiffs alleged sufficient facts to support an inference that (1) the venture's violations were a "known problem" to Defendants, and (2) Defendants failed to implement policies "sufficient to combat" the violations.

### i.   Forced Labor Violation (Perpetrator) – 18 U.S.C. § 1589(a)

Plaintiffs argue that Defendants "should have known" that their venture obtained forced labor in violation of § 1589(a). To support this claim, Plaintiffs must allege enough facts to infer that forced labor in the venture was a "known problem" among the Defendants and that Defendants failed to "implement policies sufficient to combat" the problem of forced labor.[9] *See M.A.*, 425 F. Supp. 3d at 968.

Plaintiffs argue that their work schedule and housing conditions were signs of a forced labor problem. "[L]ong hours" and "grueling work" can be signs of forced labor when paired with "intentional[] inflict[ions] or threat[s]" of harm. *Salem v. Mich. State U.*, No. 1:19-CV-220, 2021 WL 1381149, at *5-6 (W.D. Mich. Apr. 13, 2021). And while long hours do not outright imply forced labor, courts have routinely found that laborers working in excess of sixty hours per week may be compelled to do so as result of defendant's threats. *United*

---

[9] To show that a problem was a "known problem," it is not necessary to allege that Defendants knew about every threat, harm, abuse, scheme, plan, pattern, or use of force alleged by Plaintiff. Instead, § 1589(a) makes it a crime to employ "any combination" of these methods, and § 1595 only requires that Defendants "should have known" about the venture's use of the combined methods when considered together.

*States v. Toviave*, 761 F.3d 623, 629-30 (6th Cir. 2014).  Similarly, "squalid living conditions" can also be a sign of forced labor when paired with "extreme isolation, threat[s] of legal process, and violence."  *United States v. Callahan*, 801 F.3d 606, 620 (6th Cir. 2015).

Plaintiffs allege that their housing conditions were "substandard."  (2d Am. Compl. ¶ 94.)  Specifically, they allege that

- Plaintiffs shared a house with thirty other workers, (*Id.* ¶ 69);

- Plaintiffs were not provided with any alternative housing options, (*Id.* ¶ 113);

- Plaintiffs shared fewer than 1,500 square feet of floor space in an unfurnished home that lacked beds, (*Id.* ¶ 114);

- Two female workers shared the bedroom while twenty men slept on the floor, (*Id.*); and

- All thirty workers shared a single toilet and kitchen, (*Id.*).

Plaintiffs argue that Defendants were aware that housing conditions were "substandard."  They allege that

- Defendant Grow Blue Farms owns, operates, controls and/or contracts for migrant housing in Van Buren, Oceana, Berrien, Kent, and Ottawa counties in Michigan for its workforce, (*Id.* ¶ 44);

- Defendants controlled Plaintiffs' housing in Michigan, (*Id.* ¶ 70); and

- Defendants sent an inspector, Scott Walker, to inspect Plaintiffs' housing conditions, (*Id.* ¶ 71).

In their response, Plaintiffs argue that the fact that Defendants hired Walker to inspect Plaintiffs' housing can support one of two inferences: either Walker "failed to report" the conditions or, assuming he did report these conditions, Defendants "purposely ignored" him.  (Response 33, ECF No. 71; Response 34, ECF No. 72.)  Both inferences are reasonable, but the second one is most favorable to Plaintiffs, so the Court adopts that one.

Defendants argue that because Plaintiffs alleged Sanchez provided the housing, Defendants were not liable to know about the substandard conditions.  But Plaintiffs provided other reasons in their complaint to allege a "known problem," including Walker's inspections and Defendants' control over the property.

In addition to Defendants' knowledge of substandard housing, Plaintiffs also argue that Defendants were aware of their "grueling" schedule.  (Response 32, ECF No. 71; Response 33, ECF No. 72.)  Plaintiffs allege that they worked "for as many as twelve hours per day without breaks, seven days per week." (2d Am. Compl. ¶ 7.)  They also allege other facts to support that Defendants were aware of Plaintiffs' schedule, including that Defendants "controlled all aspects of [Plaintiffs'] work, including wages [and] hours." (*Id.* ¶ 81.)  And Defendants "failed to include the number of hours worked by each Plaintiff in each paystub." (*Id.* ¶ 132.)  In their response, Plaintiffs argue that Defendants "purposely omitted" the number of hours Plaintiffs had worked from their paystubs in an attempt to conceal long hours.  (Response 32, ECF No. 71; Response 33, ECF No. 72.)  Defendants point out in their reply that Plaintiffs did not allege any purposeful omission.  But Plaintiffs have alleged sufficient facts to support an inference that this was the case.

Defendants also argue in their reply that because Plaintiffs alleged that HB Hive administered paychecks, then other Defendants cannot be liable for knowing about the long hours Plaintiffs worked.  But there are other allegations in Plaintiffs' complaint to support an inference that all Defendants were aware of Plaintiffs' long hours.

Taken together, Plaintiffs' allegations of long hours and poor living conditions are enough to support a reasonable inference that forced labor was a "known problem" to Defendants.  The next question is whether Defendants failed to "implement policies sufficient to combat" this problem.

Plaintiffs argue that Defendants' hiring policies were not sufficient to prevent the hiring of a supervisor like Sanchez, who has a "history of labor violations for which he was sanctioned by federal authorities."  (*Id.* ¶ 76.)  Plaintiffs also argue that Defendants' policy of screening its workers failed to prevent those compelled to work from other countries from using fake identities.  Plaintiffs allege that Sanchez provided them with fake identities before bringing them to Michigan.  (*Id.* ¶ 59.)  When they arrived in Michigan, Defendants' administrative staff used the fake identities to complete the workers' employment forms.  (*Id.* ¶ 117.)  If the administrative staff rejected a fake identity, then Defendants allowed the workers to meet with Sanchez for another fake identity and to try again.  (*Id.* ¶ 118.)  Plaintiffs argue that this amounts to a policy by Defendants that allowed workers to bypass their own screening system, permitting forced labor in the process.

In response to Plaintiffs' arguments, Defendants invoke *Iqbal* to argue that these alleged failures to implement a policy "are 'merely consistent with'" their liability and "stop[] short of the line between possibility and plausibility of 'entitlement to relief.'"  *See Iqbal*, 556

U.S. at 678.  It is true that Defendants' alleged failures to implement a policy are consistent with liability under the TVPRA.  But the facts alleged also create more than a "sheer possibility" that Defendants "acted unlawfully."  *See id.*  This is especially true given that Plaintiffs' allegations about Defendants' screening process amount to a separate crime under the TVPRA.[10]  In light of this unlawful behavior, Plaintiffs have satisfied their pleading burden with respect to Defendants' knowledge of the venture's violation of § 1589(a).

### ii.  *Forced Labor Violation (Beneficiary) – 18 U.S.C. § 1589(b)*

Plaintiffs also allege that Defendants should have known of a forced labor violation as it pertains to § 1589(b).  The language in § 1589(b) mirrors the language in § 1595(a) for beneficiary liability, requiring a "knowing benefit" and "participation in a venture."  But § 1589(b) requires "providing or obtaining of labor or services by any means described in [§ 1589(a)]" instead of "an act in violation of this chapter" under § 1595.  More importantly, § 1589(b) also has a higher knowledge requirement ("knowing or in reckless disregard") than § 1595(a), which requires at least negligence.

It does not make sense to read §§ 1595(a) and 1589(b) together literally.[11]  And if the Court were to give full effect to Congress's inclusion of the lesser knowledge requirement of negligence in § 1595(a), the analysis of direct beneficiary liability under § 1589(b) would functionally be the same as the analysis of direct beneficiary liability under § 1589(a).  For

---

[10] Section 1592(a) outlaws the knowing destruction, concealment, removal, confiscation, or possession of another person's passport, immigration document, or government identification while in the course of a violation of § 1589.

[11] Reading these sections together would require a plaintiff to allege that a defendant participated in a venture, knowingly benefited from its participation, and that the defendant should have known that the venture itself participated in a venture, which knowingly benefited the first venture and violated § 1589(a), and the first venture knew or recklessly disregarded that fact.

that reason, the Court declines to perform a separate analysis of § 1589(b) under a theory of direct beneficiary liability.[12]  The Court will address claims relating to violations of § 1589(b) under the theory of perpetrator liability in this case instead.

### iii.  Trafficking Violation – 18 U.S.C. § 1590(a)

Plaintiffs also allege that Defendants should have known that the venture violated § 1590, which deals with trafficking.  Defendants argue that Plaintiffs only alleged legal conclusions and failed to allege facts as to this claim.  But as described earlier, Plaintiffs allege sufficient facts to show that Defendants should have known that the venture at least harbored Plaintiffs in violation of § 1589(a) by providing them with housing.  Thus, Plaintiffs' burden is met with respect to § 1590.

### iv.  Attempted Violation – 18 U.S.C. § 1594(a)

Under § 1594(a), "[w]hoever attempts to violate section[s] . . . 1589 [or] 1590 . . . shall be punishable in the same manner as a completed violation of that section."  The question is whether Plaintiffs alleged sufficient facts to support an inference that Defendants should have known that the venture attempted to violate the forced labor provision or trafficking provision.

"Criminal attempt" requires defendants to act with an intent to commit the underlying crime and to take a "substantial step" toward the completion of that crime.  *See, e.g., United States v. Brown*, 125 F.4th 1043 (11th Cir. 2025); *United States v. Larive*, 794 F.3d 1016 (8th Cir. 2015); *United States v. Ferguson*, 65 F.4th 806, 811 (6th Cir. 2023).  But when courts

---

[12] The Court also declines to analyze § 1589(b) under a theory of indirect beneficiary liability.  Because Plaintiffs allege a venture between Defendants and Sanchez where Sanchez himself also violated § 1589(a), this analysis would be mostly repetitive of Plaintiffs' § 1589(a) claim under direct beneficiary liability.

apply "attempt" in a civil case as part of a claim under § 1595(a), they do so in a broader sense, in particular when a plaintiff pleads sufficient facts to show that a defendant is liable to coerce a plaintiff even if they are unsuccessful in doing so. *See Saraswat v. Jayaraman*, No. 15-CV-4680 (PKC) (LB), 2016 WL 5408115, at *4 (E.D.N.Y. Sept. 28, 2016) (noting that the plaintiff alleged at least enough facts to show that the defendant tried to force him to work even if the plaintiff had not in fact "labored"). This application is more fitting with a plain-language understanding of "attempt" as an "act or an instance of making an effort to accomplish something, especially without success," *Attempt, Black's Law Dictionary* (12th ed. 2024), or "to make an effort, to try," *Attempt, Oxford English Dictionary* (2nd ed. 1989).

As discussed above, Plaintiffs successfully alleged that Defendants should have known that the venture violated §§ 1589(a) and 1590(a). In doing so, they have also successfully alleged facts to support a conclusion that Defendants should have known that the venture at least attempted to violate the forced labor provision.

### 2. Indirect Liability

"A plaintiff can also satisfy the elements of § 1595's beneficiary theory by imputing 'to the defendant the acts, omissions, and state of mind of an agent of the defendant' through indirect or vicarious liability." *K.L.*, 2024 WL 1332225, at *8 (quoting *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1060 (D. Colo. 2021)). Because the TVPRA itself does not address indirect liability, courts have used the common law to fill in the gaps. *K.L.*, 2024 WL 1332225, at *8 (collecting cases).

Under the common law, there are at least two ways that courts can impute an employee's acts, omissions, or state of mind to their employer. One is through the

26

defendant's status as a joint or single employer. *M.A.*, 425 F. Supp. 3d at 972. The other is through defendant's status as a principal of the agent. *Id.* at 971.

Courts typically draw on the federal common law to assess a defendant's status as a joint or single employer. This makes sense given the need for uniform federal standards and the risk that state law could frustrate the TVPRA's objectives. For these reasons, the Court chooses to apply the federal common law with reference to federal rules to determine Defendants' status as Sanchez's single employer and principal.

As mentioned earlier, Plaintiffs allege facts sufficient to support an inference that Sanchez violated §§ 1589(a), 1589(b), 1590(a), and 1594(a) as part of a venture with Defendants.[13] Plaintiffs now argue that Sanchez was an agent of Defendants, and his "acts, omissions, or state of mind" for violations of each statute can be imputed to them. The basis of Plaintiffs' theories are assessed below.

### (a) Single-Employer Status

Both the single- and joint-employer tests may treat "an entity that is not the plaintiff's formal employer . . . as if it were the employer." *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011). While the joint-employer test maintains the independence of each employing entity, the single-employer test allows a plaintiff to treat "two nominally separate entities" as "part of a single integrated enterprise." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005). The single-employer test is so broad as to treat "parent and wholly-owned subsidiary corporations" or "separate

---

[13] For the reasons described in footnote 12, the Court declines to analyze whether Sanchez's alleged violation of § 1589(b) can be imputed to Defendants.

corporations under common ownership and management" as part of a single, integrated enterprise. *Id.*

Many courts apply the joint-employment test in TVPRA cases to assess whether the knowledge, actions, or omissions of a franchisee's employees can be imputed to the franchisor. *E.g.*, *K.L.*, 2024 WL 1332225, at *9; *B.D.G. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-3202, 2023 WL 5935646, at *9 (S.D. Ohio Sept. 12, 2023). Unlike those cases, it is unclear here which Defendant was Sanchez's formal employer. To resolve this issue, Plaintiffs argue that Defendants are a single employer.[14]

To allege that Defendants were a single employer of Sanchez, Plaintiffs must allege facts sufficient to show the following four factors: "(1) interrelation of operations, *i.e.*, common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 994 (6th Cir. 1997). "None of these factors is conclusive, and all four need not be met in every case." *Id.* Control over labor relations among each entity "is a central concern." *Id.*

With respect to Defendants' "interrelation of operations," Plaintiffs allege that Defendants shared an office at 14786 Winans St. in West Olive, Michigan. (2d Am. Compl. ¶¶ 25, 30, 33, 34, 36, 39, 43.) They also allege that all four Defendants in 2017 did business

---

[14] Plaintiffs' response does not specify who—Sanchez or Plaintiffs—Defendants are a single employer of. This is likely because Plaintiffs wanted to justify treating all Defendants as a single employer for the purposes of both their TVPRA and AWPA claims. The Court already rejected this argument for the reasons listed in footnote 4. At any rate, it only makes sense under the TVPRA to analyze Sanchez as Defendants' employee, which is what the Court does here.

under the name "First Pick Farms."  (*Id.* ¶¶ 27, 29, 30, 32.)  And under that name, Defendants marketed and sold blueberries and operated a packing facility.  (*Id.* ¶ 23.)

Plaintiffs also allege facts to support that Defendants shared common ownership, management, directors, and boards.  In particular, they allege that Defendants "share the same officers and directors, including Registered Agent Jennifer Crawford and President Scott Nagelvoort."  (*Id.* ¶ 45.)  Plaintiffs also allege that all four Defendants are owned—either directly or indirectly—by Tom Mitchell.  (*Id.* ¶ 31, 37.)

Lastly, Plaintiffs allege facts to support that Defendants exercised central control over Sanchez.  They allege that Defendants, while all operating under the name "First Pick Farms," employed several hundred workers, including Sanchez.  (*Id.* ¶ 4, 23.)  They also allege that Defendants "directed" Sanchez to hire and transport part of its workforce to Michigan, (*Id.* ¶ 73), and that Defendants paid Sanchez directly, (*Id.* ¶ 77). Most importantly, they allege that Defendants determined Sanchez's "wages, hours, and discipline."  (*Id.* ¶ 21.)

Taking these factors together, Plaintiffs have alleged enough facts to support a theory that Defendants acted as a single employer of Sanchez.

### (b) Principal-Agent Status

For the reasons mentioned earlier, the Court will apply the federal common law's test to determine Defendants' status as a principal to Sanchez's role as an agent.  This approach is consistent with other courts in TVPRA cases.  *See K.L.*, 2024 WL 1332225, at *8.  The federal common law's test is similar to the standard under Michigan law, so it is likely the decision to apply federal law will not make much of a difference here.

Federal law holds a principal to account for its agent's actions when that agent acts with actual authority.  An agent acts with actual authority when "at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 373 (6th Cir. 2015) (quoting Restatement (Third) of Agency § 2.01 (A.L.I. 2006)).

Plaintiffs allege that Defendants "hired and supervised Sanchez during the 2017 blueberry season" to "act as a recruiter and field supervisor."  (2d Am. Compl. ¶¶ 75-76.) In their response, Plaintiffs argue that Sanchez's decision to traffic workers from North Carolina to Michigan was consistent with Defendants' orders to recruit workers.  Defendants argue that Plaintiffs failed to allege that Defendants authorized Sanchez to do anything that would violate the forced labor or trafficking provisions of the TVPRA.  But Plaintiffs do not need to allege this kind of authority; they only need to allege facts to support that Sanchez had a reasonable belief that the Defendants wished him to act in the ways he did.  Taking all of Plaintiffs' allegations together, they have satisfied this threshold.

## B. Perpetrator Liability

Unlike Plaintiffs' claims under beneficiary liability, perpetrator liability requires Plaintiffs to allege sufficient facts to support actual, direct violations of the TVPRA's criminal sections by Defendants—independent of Sanchez.  Each violation is considered in turn.

### 1. Forced Labor Violation (Perpetrator) – 18 U.S.C. § 1589(a)

To establish the *actus reus* for a violation of § 1589(a), a plaintiff must allege that a defendant "obtained or provided labor or services" through at least one of the methods

enumerated in the statute.  To satisfy the *mens rea* requirement, a plaintiff must allege that the providing or obtaining of forced labor was done "knowingly."  This "element requires proof that the defendant knew (1) that the enumerated 'circumstance existed' and (2) that the defendant was obtaining the labor in question as a result."  *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1156 (9th Cir. 2022) (citing *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008)).

In their motion, Defendants argue that Plaintiffs failed to allege facts supporting an inference that Defendants had actual knowledge of Sanchez's use of the prohibited methods under the statute.  Specifically, they argue that they were never notified, informed, or overheard of any alleged threats made by Sanchez.

Defendants are right.  Plaintiffs failed to allege facts to support an inference that Defendants knew that any of the alleged circumstances under § 1589(a) existed.  In their complaint, Plaintiffs allege that Defendants knew about their grueling schedule and substandard housing.  And although Defendants' knowledge of these problems supports an inference that Defendants should have known of a potential violation for the purposes of beneficiary liability, these facts do not support an inference that Defendants had actual knowledge for the purposes of perpetrator liability.  In addition, it is unclear from Plaintiffs which method enumerated under the statute—if any—Defendants are alleged to have committed independent of their relationship with Sanchez, so the *actus reus* is also not satisfied.  Thus, Defendants' motion is granted with respect to this claim under this theory of liability.

31

### 2. Forced Labor Violation (Beneficiary) – 18 U.S.C. § 1589(b)

Similar to § 1595(a), a defendant violates § 1589(b) when they "knowingly benefit" from "participation in a venture" and that venture violates the TVPRA, specifically § 1589(a). These three elements are at least interpreted as consistent with the requirements of § 1595(a). *See Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019). But unlike § 1595(a), a defendant must at least *recklessly disregard* the venture's violation. In other words, constructive knowledge is not enough. Defendants argue—without elaboration—that Plaintiffs failed to allege facts to support an inference that Defendants recklessly disregarded the venture's violation of subsection (a).

In the direct beneficiary analysis above, the Court concluded that Defendants were negligent with respect to the venture's violations of § 1589(a) because there was a known forced labor problem and Defendants failed to implement sufficient policies to combat the problem. But is this enough to say that Defendants at least recklessly disregarded the venture's violation of § 1589(a)?

Whether a defendant recklessly disregarded a venture's violation depends on them "ignor[ing]" it or "treat[ing]" it "without proper respect and consideration." *Disregard*, *Black's Law Dictionary* (12th ed. 2024). Courts analyzing whether Defendants had knowledge or were in reckless disregard of a venture's violations tend to require that a defendant was aware of the venture's actual violations and chose to do nothing about it. For instance, in one case, the plaintiff, Ricchio, alleged that a hotel-owning couple, the Patels, actually saw a member of their venture, McLean, violate § 1589(a). The Patels chose to ignore these violations:

32

> McLean and Mr. Patel enthusiastically expressed this intent by exchanging high-fives in the motel's parking lot while speaking about "getting this thing going again," in circumstances in which McLean's coercive and abusive treatment of Ricchio as a sex slave had become apparent to the Patels. Ms. Patel had not only nonchalantly ignored Ricchio's plea for help in escaping from McLean's custody at the motel but, when visiting the rented quarters to demand further payment, had shown indifference to Ricchio's obvious physical deterioration. And in plain daylight view of the front office of the motel, either of the Patels on duty there would have seen McLean grab Ricchio, kick her, and force her back toward the rented quarters when she had tried to escape.

*Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (holding that the defendants were "at the least, in reckless disregard").  In another case, a court inferred that a defendant had actual knowledge of a venture's violations for similar reasons as the Patels.  There, the defendant had "general knowledge" of the venture's violations as well as a role overseeing health and safety issues in the venture's labor supply chain.  *F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158, 1193-94 (D. Colo. 2025).  Given these two examples, it is difficult to determine where reckless disregard ends and actual knowledge begins.  But in this case, it is enough to say that Defendants must be at least aware of the venture's actual violations and fail to do anything about it.

Here, Plaintiffs allege that they had a grueling schedule and poor housing conditions.  They also argue that Defendants' decision to hire Sanchez was in reckless disregard of his past labor violations.  While these may be enough for constructive knowledge, Plaintiffs do not allege sufficient facts to infer that Defendants were acting in reckless disregard for the venture's violations.  As a result, this claim fails with respect to perpetrator liability.

### 3. Trafficking Violation – 18 U.S.C. § 1590(a)

Section 1590 requires that a defendant "knowingly" recruit, harbor, transport, provide, or obtain labor or services in violation of this chapter.  Plaintiffs allege that Defendants—independent of Sanchez—at least harbored and obtained Plaintiffs' labor.  But Plaintiffs do not allege sufficient facts to support an inference that Defendants did so knowing that it violated another part of the TVPRA.  And so this claim under a theory of perpetrator liability is dismissed.

### 4. Attempted Violation – 18 U.S.C. §1594(a)

The Court previously examined whether Defendants should have known that the venture violated § 1594(a) when it attempted to violate §§ 1589 and 1590.  But under perpetrator liability, the question is whether Defendants independently attempted to violate §§ 1589 or 1590.  Defendants argue that Plaintiffs did not establish an attempt to violate any section of the TVPRA.

In response, Plaintiffs argue that Defendants violated the TVPRA when they gave license to their agents, both Sanchez and Scott Walker, to "facilitate housing [their] workforce in particularly egregious housing." (Response 39, ECF No. 72.)  Plaintiffs are confused about what is required under perpetrator liability and indirect beneficiary liability.  This confusion is understandable because if an agent or employee's knowledge, actions, and omissions can be attributed to a defendant, then that defendant may be liable for any crime that the employee or agent commits.  But the difference under perpetrator liability is that the agent or employee's actions are not considered at all.

Regardless of that confusion, Plaintiffs allege that Defendants were Sanchez's employer, that Sanchez moved Plaintiffs to Michigan to work on Defendants' farm, and that Defendants provided Plaintiffs with housing.  These facts together are enough to infer that Defendants attempted to obtain forced labor as described under § 1589(a) and harbored forced laborers as part of that attempt in violation of § 1590(a).  Thus, this claim also survives at this stage under a theory of perpetrator liability.

## VI. MIGRANT AND SEASONAL AGRICULTURAL WORKERS PROTECTION ACT (AWPA)

The AWPA's purpose is to "assure necessary protections for migrant and seasonal agricultural workers."  29 U.S.C. § 1801.  Plaintiffs allege that that Defendants misrepresented the terms and conditions of their employment under § 1821(f), failed to disclose the terms of employment under § 1821(a)(1-7), failed to keep records under § 1821(d), failed to comply with the transportation requirements of § 1841(b)(1), did not pay all wages when due under § 1822(a), did not comply with housing requirements under § 1823, violated the posting requirements of § 1821(b), and did not comply with the terms of the working arrangement as described under § 1822.

Defendants do not challenge whether Plaintiffs alleged sufficient facts to support these causes of action.  Instead, they argue that Plaintiffs do not qualify for AWPA protections because they were part of the H-2A visa program.  And even if Plaintiffs did qualify for these protections, they argue, Plaintiffs failed to allege facts sufficient to show that Defendants were their joint employers.  Each question is considered in turn.

35

### A. Plaintiffs' Status as "Migrant Agricultural Workers"

The AWPA protections cover migrant agricultural workers. *See id.* §§ 1821-23, 1841-44. The statute defines these workers as "individual[s] who [are] employed in agricultural employment of a seasonal or other temporary nature, and who [are] required to be absent overnight from [their] permanent place of residence." *Id.* § 1802(8)(A). This definition explicitly excludes "any temporary nonimmigrant alien who is authorized to work in agricultural employment in the United States under sections 1101(a)(15)(H)(ii)(a)," which is also known as the H-2A program. *Id.* § 1802(8)(B)(3); *see also Montize v. Pittman Props. Ltd. Partn. No. 1*, 719 F. Supp. 2d 1052 (W.D. Ark. 2010).

In the Second Amended Complaint, Plaintiffs allege that they entered the United States from their permanent residence of Mexico as part of the H-2A program to work in North Carolina. (2d Am. Compl ¶ 18.) Defendants argue that Plaintiffs' status as H-2A workers excludes them from AWPA's protections. Plaintiffs argue that their H-2A status expired when they left for Michigan. They also allege that they violated their H-2A agreement when they left their old employer in North Carolina. (*Id.* ¶ 87.) But Defendants say that Plaintiffs failed to allege specific facts to explain how their H-2A status could have expired.

Whether a worker falls under an exception to the AWPA's definition of "migrant agricultural worker" is an affirmative defense, and as a result, it is Defendants' burden to demonstrate that the H-2A exception applies. *See Soliz v. Plunkett*, 615 F.2d 272, 275 (5th Cir. 1980). An H-2A worker is considered to have "abandoned" their job after they "fail[] to report to work at the regularly scheduled time for 5 consecutive working days without the

consent of the employer." 20 C.F.R. § 655.122(n)(3). Plaintiffs here have alleged that they left North Carolina for more than five days. Thus, it is reasonable to infer that their H-2A status expired, and the AWPA protections applied to them while in Michigan. *See Reyes-Trujillo*, 513 F. Supp. 3d at 790 n.18. Defendants do not allege facts to support an inference otherwise.

### B. Defendants' Status as Joint Employers

Under the AWPA, whether a worker is "employed" by an entity is assessed the same way as whether a worker is "employed" by an entity under the FLSA. 29 U.S.C. § 1802(5). The FLSA defines "employ" as "to suffer or permit to work." *Id.* at § 203(g). The FLSA defines "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* at § 203(d). This definition is broader than how it "would be interpreted in traditional common law applications" given "[t]he remedial purposes of the FLSA." *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) (quoting *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (per curiam)). Indeed, the definition of employer defies "common law categories" and "classifications under other statutes." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950)).

Given the FLSA's broad definition of "employer," courts have interpreted the statute to also include joint employers. Under the AWPA regulation, "joint employment" is defined as "a condition in which a single individual stands in the relation of an employee to two or more persons at the same time." 29 C.F.R. § 500.20(h)(5). The question of joint employment under the AWPA is determined by answering whether multiple employers are

"completely disassociated."  *Id.*  Again, the AWPA defines "joint employment" with reference to how the term is applied in FLSA cases.  And "[a]ny factor" under the FLSA "that is relevant to whether an entity is an employer is also relevant to whether the entity is a joint employer."  *Reyes-Trujillo*, 513 F. Supp. 3d at 783.

The factors applied by the Sixth Circuit in FLSA cases are meant to determine the "economic reality" of the worker's arrangement, setting aside any labels that the employers themselves use.  *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019). To that end, a court must examine:

> (1) the permanency of the relationship between the parties;
>
> (2) the degree of skill required for the rendering of the services;
>
> (3) the worker's investment in equipment or materials for the task;
>
> (4) the worker's opportunity for profit or loss, depending upon his skill;
>
> (5) the degree of the alleged employer's right to control the manner in which the work is performed; and
>
> (6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* (citation modified).  The Sixth Circuit has also considered "whether the business had 'authority to hire or fire the plaintiff,' and whether the defendant-company 'maintains the plaintiff's employment records.'"  *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015).  "None of these factors is determinative on its own, and each must be considered 'with an eye toward the ultimate question—[the worker's] economic dependence on or independence from' the alleged employer."  *Acosta*, 915 F.3d at 1055.

In addition to the Sixth Circuit's FLSA factors, the AWPA regulations also include a separate but overlapping set of considerations. Like the FLSA factors, the ultimate question of employment under AWPA is determined by economic reality—"whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." 29 C.F.R. § 500.20(h)(5)(iii). To determine "economic reality" the regulation guides courts to consider:

> (A) Whether the agricultural employer . . . has the power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed . . . ;

> (B) Whether the agricultural employer . . . has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s);

> (C) The degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;

> (D) The extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training;

> (E) Whether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association;

> (F) Whether the work is performed on the agricultural employer/association's premises, rather than on premises owned or controlled by another business entity; and

> (G) Whether the agricultural employer/association undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

*Id.* § 500.20(h)(5)(iv). Like the FLSA factors, the AWPA regulation factors are also not exhaustive. *See Torres-Lopez v. May*, 111 F.3d 633, 640 (9th Cir. 1997). No single factor

is dispositive, and not all factors—or even most factors—need to be found for a joint employment relationship to exist.  *Id.*  The Court considers both the FLSA factors as described in *Acosta* and the AWPA regulation factors below.

### 1. The FLSA Factors

#### (a) Permanency of the Relationship

This factor considers the "length and regularity of the working relationship between the parties." *Keller*, 781 F.3d at 807.  "[E]ven short, exclusive relationships" may satisfy this factor.  *Id.*  For example, in agricultural harvesting, "an exclusive season-long relationship is indicative of permanency." *Perez v. Howes*, 7 F. Supp. 3d 715, 723 (W.D. Mich. 2014).

Plaintiffs allege that they worked for Defendants for the duration of the blueberry season.  Specifically, they allege that they started picking blueberries in June 2017, and Plaintiff Guzman continued through August 2017 while Plaintiff Velasco continued through September 2017.  (2d Am. Compl. ¶ 19.)  They worked twelve-hour days and seven-day weeks.  (*Id.* ¶ 90.)  Plaintiffs do not specify whether this work was their only source of income, but given such a demanding schedule, they are entitled to the inference that it was.  Thus, this factor weighs in favor of joint employment.

#### (b) Degree of Skill Required

The question here is whether Defendants' profits increased because of Plaintiffs' "initiative or foresight" or whether Plaintiffs' work was "more like piecework." *Keller*, 781 F.3d at 809.  This question is answered "with reference to the task[s] being performed." *Acosta*, 915 F.3d at 1055.  Plaintiffs harvested blueberries for Defendants.  They were paid

according to the weight of the berries they picked, which is piecework.  (2d Am. Compl. ¶¶ 124-25.)  Thus, this factor weighs in favor of joint employment.

### (c) Workers' Investment in Equipment or Materials

"[C]ourts must compare the worker's investment in the equipment to perform his job with the company's total investment, including office rental space, advertising, software, phone systems, or insurance."  *Keller*, 781 F.3d at 810.  Plaintiffs do not allege that they invested anything into Defendants' business.  Instead, they allege that Defendants "provided all equipment, such as buckets for the workers, bins for the weighed blueberries, and weigh stations."  (2d Am. Compl. ¶ 122.)  Without an affirmative allegation that Plaintiffs did not themselves invest any of their own capital into a business, this factor does not weigh for or against joint employment.

### (d) Workers' Opportunity for Profit or Loss

This factor measures the extent that a worker's opportunity for profit depends on their managerial or technical skills.  *Acosta*, 915 F.3d at 1059.  In other words, if a worker further "hone[d] their managerial skill," would it lead to greater pay?  *Id.*  The answer here is no. As mentioned above, Plaintiffs were paid according to the weight of the blueberries they picked, not their managerial or technical skill.  Thus, this factor weighs in favor of joint employment.

### (e) Employers' Right to Control the Manner in Which the Work is Performed

What matters for this factor is "whether the company 'retains the right to dictate the manner' of the worker's performance."  *Acosta*, 915 F.3d at 1060.  Plaintiffs allege that Defendants "assigned [them] and the other blueberry workers their work schedules including

their stop and start times." (2d Am. Compl. ¶ 123.)  They allege that Defendants told them which crop to harvest, which row to work in, and which specific tasks they would complete. (*Id.* ¶ 121.)  Defendants' employee, Sanchez, also supervised their work.  (*Id.* ¶ 57.)  In light of these circumstances, this factor weighs in favor of joint employment.

### (f) Service is Rendered as an Integral Part of the Employers' Business

"The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship."  *Keller*, 781 F.3d at 815. Plaintiffs allege that Defendants operate a blueberry farm and that Plaintiffs picked blueberries on that farm.  Defendants' business could not function without the services that Plaintiffs provided.  *See Acosta*, 915 F.3d at 1055.  This factor thus weighs in favor of joint employment.

### (g) Balancing the Factors

Five of the factors weigh in favor of joint employment while one is neutral.  Thus, Plaintiffs have alleged sufficient facts to support that Defendants were their joint employers.

### 2. The AWPA Regulation Factors

The analysis of the AWPA regulation factors is less difficult because Defendants were Plaintiffs' joint employers under the FLSA.  As mentioned above, Plaintiffs alleged that Defendants supervised and instructed Plaintiffs in doing their work.  They allege that Defendants determined their pay rate based on the weight of the berries picked.  They allege facts sufficient to show that they had a sufficiently permanent relationship with Defendants in the context of their agricultural work.  The job they were paid to do—pick blueberries— was repetitive and did not require much skill.  Their job was integral to Defendants' business.

Plaintiffs allege that they worked on a farm that was operated by Defendants. And they allege that Defendants completed Plaintiffs' paperwork using false identities, provided Plaintiffs housing, transportation, tools, and equipment required to do their job.

Considering both the FLSA test and the AWPA regulations regarding joint employment together, Plaintiffs have alleged sufficient facts to show that Defendants were their joint employers for the sake of the AWPA. Thus, their AWPA claims survive dismissal.

## VII. CONCLUSION

For the reasons provided, the Court will grant in part and deny in part Defendants' motions to dismiss (ECF Nos. 64, 67).

All claims against Defendants Grow Blue Farms Hourly and Grow Blue Farms Salary will be dismissed. Plaintiffs' Count II for violations of 18 U.S.C. § 1589(b) against all remaining Defendants will be dismissed.

The Court will enter an order in accordance with this Opinion.


Dated: January 2, 2026                                    /s/ Paul L. Maloney
                                                          Paul L. Maloney
                                                          United States District Judge